UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Lake Home Products, LLC,

                Plaintiff,

v.

Sandee Manufacturing Company,

                Defendant.

**ORDER**

Civil No. 03-6331 (MJD/JGL)

Richard I. Diamond, Jesse Kibort, Richard I. Diamond, P.A., Counsel for Plaintiff.

Amanda M. Cialkowski and Scott A. Smith, Lewis Nilan & Johnson, P.A.; John J. O'Malley, Seyfarth Shaw LLP, Counsel for Defendant.

## I. INTRODUCTION

In this contractual dispute brought by a purchaser of plastic parts against the supplier of those parts, Plaintiff asserts that Defendant failed to fulfill its contractual obligations in providing "plastic extrusion parts" that would be used for Plaintiff's products. Defendant now brings a motion for summary judgment, asserting that Plaintiff's claims are barred by the statute of limitations, by the doctrine of accord and satisfaction, and because Plaintiff has not disclosed any expert witnesses. For reasons more fully explained below, Defendant's motion is denied in part and granted in part.

## II. FACTUAL BACKGROUND

Plaintiff Lake Home Products, LLC, was a Minnesota corporation that intended to manufacture "plastic products . . . for storing recreational items for

people who have waterfront homes." Defendant Sandee Manufacturing Company is an Illinois company that manufactures plastic parts.

In May 1997, the parties entered into a contract where Defendant would manufacture "plastic extrusions" that Plaintiff would then assemble into dockside accessory storage units for lakeside properties. Plaintiff stated that they selected Defendant—even though it was not the low bidder—because of Defendant's "turnaround time on tooling and finished parts," as "this was a critical factor to the timing of [Plaintiff's] launch" of its new product. The agreement stated that the "production volumes of finished parts [are] to be shipped to Lake Home Products in less than eight weeks."

On May 21, 1997, Plaintiff placed its initial order for parts. Defendant tooled the plastic molds, produced the parts, and sent its first set of samples on July 8, 1997. Plaintiff hired a consultant, $P=CAD^2$, to analyze the parts to determine whether they conformed to the required specifications. $P=CAD^2$ rejected three of the four samples, claiming that they were not within required tolerances. On September 11, a $P=CAD^2$ representative sent Defendant a letter, asserting that the problems were dimensional (size, shape, and failure to meet the tolerances) and involved appearance (an unacceptable and inconsistent finish). On September 29, 1997, $P=CAD^2$ rejected another batch of parts. Through the following months, Defendants continued to manufacture and ship parts, and $P=CAD^2$ continued to reject them.

On January 7, 1998, the parties discussed production issues, and Plaintiff stated that Defendant's delay was causing Plaintiff "significant delays in launching and creating serious financial losses." Defendant then promised that "all of our extrusions would be delivered meeting specifications no later than the second week of March 1998."

Between March and May 1998, P=CAD$^2$ sent a number of letters to Defendant, giving "informal approval for dimensions only." Each letter included engineering drawings and corrections; some of those letters gave approval for Defendant to run the parts, while others did not.

In August 1998, the parties had a telephone conference in which it became clear that Plaintiff desired parts that could be assembled into aesthetically pleasing units. With that knowledge, the parties essentially removed P=CAD$^2$ from the process, and the parties focused on the "final assembly box" rather than by part dimension and tolerance.

By September 30, 1998, Defendant had delivered a complete production run of parts that undisputedly met all contractual requirements. But Plaintiff asserts that Defendant's 63-week delay, through the Summer of 1999, harmed Plaintiff through its inability to meet contractual obligations to its wholesalers and other customers. Consequently, Plaintiff refused to pay Defendant's invoices, claiming breach of contract and warranty, since Plaintiff did not receive finished parts within the eight-week period specified in the agreement.

On March 29, 1999, Plaintiff sent Defendant a letter complaining of its losses, asking whether Defendant could replicate its successful first run, seeking credit for all outstanding invoices, and asking that all new orders be given "rush status." Defendant responded on April 12, 1999, noting its confidence that it could replicate the first run, declining to credit all outstanding invoices (but offering to credit all early-shipment charges), and stating that because of the custom materials involved, a "rush" shipment would still require lead time of eight to ten weeks.

Plaintiff viewed Defendant's response as unreasonable and in June 1999 retained legal counsel, who threatened Defendant with litigation. On July 14, 1999, the parties' presidents reached oral agreement that Defendant would credit Plaintiff's outstanding invoices to date—an amount totaling $26,519.29; that the parties would sign off on representative, acceptable parts; and that those approved samples would be the benchmark for future production runs. But the "rush order" issue was never agreed upon.

In late Summer 1999, Defendant agreed to credit Plaintiff for the unpaid invoices, and the two parties briefly resumed their business relationship. But this reconciliation was brief, coming to an end by early 2000. Plaintiff asserts that the relationship ceased because Defendant again failed to fulfill contractual obligations both by failing to meet its specifications and quality standards, and by failing to deliver a conforming product within a reasonable timeframe.

4

On February 9, 2000, Defendant sent Plaintiff a letter saying that an internal review demonstrated that its parts met specifications and that each polymer lot produced a different tolerance, and it could not find a supplier who would guarantee a consistent tolerance from lot to lot. Defendant concluded by stating that it could no longer do business with Plaintiff.

Plaintiff commenced this action in November 2003, and Defendant now brings this Motion for Summary Judgment.

## III. DISCUSSION

### A. Summary Judgment Standard

When considering motions for summary judgment, a court must determine "whether the record, when viewed in the light most favorable to the non-moving party, shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Palesch v. Mo. Comm'n on Human Rights, 233 F.3d 560, 565 (8th Cir. 2000); see Fed. R. Civ. P. 56(c). The moving party bears the burden of showing that there is no disputed issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

For these purposes, "[t]he non-moving party is entitled to the benefit of all reasonable inferences to be drawn from the underlying facts in the record," though "[t]he non-moving party may not merely rest upon allegations or denials in its pleadings, but must set forth specific facts by affidavits or otherwise showing that there is a genuine issue for trial." Palesch, 233 F.3d at 565-66 (citations

omitted). As such, a "nonmovant must present more than a scintilla of evidence and must advance specific facts to create a genuine issue of material fact for trial." Naucke v. City of Park Hills, 284 F .3d 923, 927 (8th Cir. 2002). Further, a nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts" and "where the record as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Kiemele v. Soo Line R. Co., 93 F.3d 472, 474 (8th Cir. 1996) (quotation and citation omitted).

### B. Statute of Limitations

Defendant first argues that Plaintiff has failed to satisfy the statute of limitations, which states in part that "[a]n action for breach of any contract for sale must be commenced within four years after the cause of action has accrued." MINN. STAT. § 336.2-725. The statute continues as follows:

> (2) A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered.

Id.

Defendant cites events occurring more than four years before the filing of the Complaint on November 5, 2003, and it argues that all claims related to those

events are barred by the four-year statue of limitations. But under Minnesota law, a cause of action accrues when the breach occurs, and none of these events can be considered a breach. <u>See</u> MINN. STAT. § 336.2-725. Rather, the true breach occurred when Defendant chose to terminate its relationship with Plaintiff on February 9, 2000. Because this date is well within the four-year statute of limitations, Plaintiff's breach-of-contract claims are not time-barred.

In similar case, the limitations period accrued when one party announced that it would no longer manufacture products under the other party's brand. <u>AKA Distrib. Co. v. Whirlpool Corp.</u>, 948 F. Supp. 903, 906 (D. Minn. 1996) (Doty, J.) (relying upon dates of party's announcement and termination of parties' relationship in breach-of-contract claim). In the same way, the limitations period here did not begin accruing until February 9, 2000, when Defendant announced its cessation of the parties' business relationship.

Under Minnesota law, a limitations period is tolled by a defendant's promises to repair its defects in production, which may consist of negotiations and attempts to cure inadequate products. <u>See</u> <u>Church of the Nativity of Our Lord v. WatPro, Inc.</u>, 474 N.W.2d 605, 611 (Minn. Ct. App. 1991) (limitations period tolled by defendant's promises to extend its warranty and by breach of its promise to repair), <u>aff'd</u> 491 N.W.2d 1 (overruled on other grounds). Here, viewing the facts in a light most favorable to Plaintiff, Defendant continued to ship nonconforming products well into the limitations period. In light of Defendant's

7

continued promises to repair those defects, the limitations period actually began to accrue on February 9, 2000, when Defendant announced its termination of the parties business relationship.

Because the Court concludes that all facts related to Plaintiff's breach-of-contract claims fall within the applicable limitations period, and because Defendant concluded that Plaintiff states a claim for damages regarding the *first* production run, the Court need not address Defendant's contention that Plaintiff has failed to state a claim for damages on the *second* production run, alone.

### C. Economic Loss Damages in Tort

Defendant next contends that Plaintiff's negligence claim is barred by the economic loss doctrine,[1] which states as follows:

> (a) Economic loss that arises from a sale of goods that is due to damage to tangible property other than the goods sold may be recovered in tort as well as in contract, but economic loss that arises from a sale of goods between parties who are each merchants in goods of the kind is not recoverable in tort.
>
> (b) Economic loss that arises from a sale of goods, between merchants, that is not due to damage to tangible property other than the goods sold may not be recovered in tort.
>
> (c) The economic loss recoverable in tort under this section does not include economic loss due to damage to the goods themselves.
>
> . . .

---

[1] Because this case involves goods sold prior to 2000, the pre-2000 version of the economic loss doctrine applies. See MINN. STAT. § 604.10 (1999).

MINN. STAT. § 604.10 (1999).

Defendant argues that because Plaintiff alleges no damages or harm to other property, Plaintiff's tort claims are barred by the economic loss doctrine. But Plaintiff is not a "merchant" of goods under MINN. STAT. §§ 604.10 and 336.2-104, but it is instead a "consumer" of the goods, making the economic loss doctrine inapplicable.

Under Minnesota law, an entity is a "merchant" if it possesses specialized knowledge or skill peculiar to the goods purchased. See Regents of the Univ. of Minn. v. Chief Indus., 106 F.3d 1409, 1412 (8th Cir. 1997). Specifically, the statute states that a "merchant" is

> a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or skill may be attributed by his employment of an agent or broker or other intermediary who by his occupation holds himself out as having such knowledge or skill.

MINN. STAT. § 336.2-104(1) (1999). Similarly, a transaction "between merchants" is "any transaction with respect to which both parties are chargeable with the knowledge or skill of merchants." Id. at § 336.2-104(3) (1999). But under Minnesota law, not every large, sophisticated purchaser is a "merchant," just as an informed and careful individual consumer does not automatically become a merchant. Minn. Forest Prods., Inc. v. Ligna Mach., Inc., 17 F. Supp. 2d 892, 905

(D. Minn. 1998) (interpreting Minnesota's version of the Uniform Commercial Code).

Here, Plaintiff has provided sufficient evidence to demonstrate that it lacks the knowledge or skill to be a merchant. It was a new start-up company without a great deal of experience in the plastic-parts industry. Further, its retaining a third party, P=CAD$^2$, to analyze whether the parts met the required specifications provides additional evidence of its lack of expertise. Regardless, the question of whether a party is a "merchant" under the UCC is a question of fact for a jury to decide. Id. As such, genuine issues of material fact exist, and the economic loss doctrine does not justify judgment of Plaintiff's tort claims as a matter of law.

### D.  Accord and Satisfaction

Defendant next asserts that all claims should be barred by the doctrine of accord and satisfaction, which

> acts to discharge a contract or a cause of action. It is itself an executed contract, and it may be expressed or implied from circumstances which clearly and unequivocally indicate the intention of the parties. . . . If the accord constitutes a binding contract and is fully performed, the original liability is discharged.

Indus. Graphics, Inc. v. Asahi Corp., 485 F. Supp. 793, 800-01 (D. Minn. 1980) (omission in original) (quoting Roaderick v. Lull Eng'g Co., 208 N.W.2d 761, 764 (Minn. 1973)).

An agreement constituting an accord and satisfaction need not be expressed, but a court may look to the conduct of the parties to determine whether an accord and satisfaction exists. Weed v. Comm'r of Revenue, 550 N.W.2d 285, 288 (Minn. 1996). An accord and satisfaction is conclusive regarding matters actually included in the settlement, which is viewed objectively. Popp Telcom v. Am. Sharecom, Inc., 210 F.3d 928, 942 (8th Cir. 2000) ("Arguments of subjective intent do not trump plain language of objective intent.") (interpreting Minnesota law). Absent evidence of an express agreement, a court will look to the conduct of the parties to determine whether the parties fully performed pursuant to the accord, and if they have, satisfaction in presumed. Ladwig & Ladwig, Inc. v. Orlin Ladwig, Inc., 372 N.W.2d 408, 411 (Minn. Ct. App. 1985); see Indus. Graphics, Inc. v. Asahi Corp., 485 F. Supp. 793, 801-02 (D. Minn. 1980).

Here, Defendant contends that after Plaintiff's threats of litigation regarding the first production run, the parties reached an accord and satisfaction through the series of demands and responses in the spring and summer of 1999. In this motion for summary judgment, viewing all facts in a light most favorable to Plaintiff, material facts exist as to the existence of an accord and satisfaction.

In March 1999, Plaintiff threatened litigation unless Defendant (1) replicates the first run in a timely manner, (2) credited Plaintiff's account in full, and (3) gave future orders "rush status." In April, Defendant provided a counter-proposal, where it (1) would replicate the first run; (2) would decline to

11

fully credit Plaintiff's account but would credit early shipment charges; and (3) stated that "rush" shipments for custom materials still involved eight to ten weeks' lead time.

On July 14, 1999, the parties spoke via telephone, and Defendant sent a follow-up letter stating that the alleged agreement involved (1) Defendant issuing a credit memo for all outstanding invoices totaling $26,519.29; (2) Plaintiff's approving and sending acceptable sample parts to Defendant, where those approved samples would be the benchmark for future production runs; and (3) Defendant's understanding that the agreement "resolve[d] all issues raised by [Plaintiff] and [its] attorney." On August 9, 1999, Plaintiff responded in a letter "to clarify [the parties'] complete understanding prior to proceeding," and demanded that Defendant fill all orders within three weeks. Defendant rejected that demand on October 1, 1999, stating that it "has never and will never operate with any customer seeking to do business in the manner described," reiterating the lead time required with custom manufacturing, and requesting that Plaintiff send approved extrusions to be used as benchmarks. Defendant, in that letter, stated that "[t]hese are the terms on which we could continue to do business."

Plaintiff responded that same day, explaining that he did not view the terms as new terms, but stated that "[i]n the hope that we can recover this relationship and do have agreement, I will sign and date two lengths of each extrusion and have them shipped to you immediately." Plaintiff then issued a

purchase order for a second production run on October 13, 1999. Plaintiff has presented evidence that four out of the five extrusions that Defendant produced failed to meet the contractual specifications.

Defendant contends that the parties had reached an accord and satisfaction, but material facts exist from which a jury could reasonably determine that the parties lacked the requisite objective intent and failed to fully perform their duties under the alleged accord. A jury may reasonably conclude that a complete accord did not exist because the parties did not reach a full agreement on the terms, including the time in which Defendant was required to deliver the parts. Even more, material facts exist as to whether Defendant fully performed pursuant the alleged accord by replicating the first run or by providing the parts in a timely manner. As such, these questions of material fact are inappropriate for summary judgment and are instead properly considered by a jury.

### E.  Failure to Disclose Expert Testimony

Defendant lastly argues that because Plaintiff has not disclosed any expert witnesses, pursuant to FED. R. CIV. P. 26(A)(2)(A) and FED. R. EVID. 701 & 702, Plaintiff's claims must fail. But Plaintiff contends that it has properly disclosed its employee, Timothy Pearcy, as a witness who is qualified to provide expert testimony.

Defendant argues that to successfully bring this breach-of-contract claim, Plaintiff must demonstrate "scientific, technical, or other specialized knowledge"

13

through an expert witness. Rule 702 is permissive, not obligatory, stating that an expert witness "may" testify if that knowledge "will assist the trier of fact to understand the evidence or to determine a fact in issue." FED. R. EVID. 702.

Rule 26 states that a party must "disclose to other parties the identity of any person who may be used at trial to present evidence under Rules 702, 703, or 705 of the Federal Rules of Evidence." FED. R. CIV. P. 26(a)(2)(A). Federal Rules of Evidence 701 and 702 were "designed to prevent a party from using lay opinion testimony to subvert the disclosure and discovery requirements of [Rules 26 and 16] and the reliability requirements for expert testimony." United States v. Martinez-Figueroa, 363 F.3d 679, 682 (8th Cir. 2004) (quotation omitted). Sanctions for failure to disclose the identity of an expert witness under Rule 26 may include the prohibition from providing the undisclosed witness or information, unless a party had substantial justification for failing to make such a disclosure. FED. R. CIV. P. 37(c)(1).

Defendant argues that for Plaintiff to prevail in this breach-of-contract action, it must use expert testimony to demonstrate that the extruded plastic parts did not satisfy contract specifications or industry standards. See United States v. Shedlock, 62 F.3d 214, 219 (8th Cir. 1995) (expert testimony "concerns matters beyond the knowledge of average individuals"). But Defendant's arguments must fail for two reasons.

First, a jury need not have expert testimony to understand whether Defendant's proffered parts met the contractual requirements here. See FED. R. EVID. 702 (stating experts "may testify" if the expert testimony "will assist the trier of fact to understand the evidence or to determine a fact in issue"). Plaintiff has undisputedly disclosed Mr. Pearcy as a witness, and as Plaintiff's employee, he may provide testimony regarding the intent of the contract and its contents without testifying as an "expert" under Rule 702. Randolph v. Collectramatic, Inc., 590 F.2d 844, 848 (10th Cir. 1979) (noting that "[t]here is no fixed or general rule that Requires expert testimony" and that "admission of such testimony is within the sound discretion of the trial court"); United Telecommunications, Inc. v. Am. Television & Communications Corp., 536 F.2d 1310, 1317 (10th Cir. 1976) (holding that "expert testimony is not necessary where the matter in issue is such that the jury can be expected to draw the correct inferences from the facts presented" and that particular expert "will not provide material assistance to the jurors"); LaPlante v. Radisson Hotel Co., 292 F. Supp. 705, 707 (D. Minn. 1968) (holding that court was "not convinced that expert testimony was required or would necessarily have been helpful to the jury"); Wartsila NSD North Am., Inc. v. Hill Intern., Inc., 342 F. Supp. 2d 267, 282-83 n.9 (D.N.J. 2004) (holding expert not necessary, in breach-of-contract case, to establish breach of duty). This position is further bolstered by the parties' agreement that the primary consideration, and Plaintiff's ultimate desire was that the pieces "could be

15

assembled into aesthetically pleasing units." Expert testimony is not necessary to demonstrate or explain aesthetics.

Second, the Court has wide discretion in imposing any sanctions contemplated by Rule 37(c)(1). <u>Boardman v. Nat'l Med. Enters.</u>, 106 F.3d 840, 843 (8th Cir. 1997); <u>see</u> <u>Hazen v. Pasley</u>, 768 F.2d 226, 229 (8th Cir. 1985) (affording district courts "great latitude" in imposing discovery sanctions). Plaintiff's suggested sanction of dismissal is inappropriate here because, as explained above, Mr. Pearcy has been disclosed as a witness, and the subject matter is not of the nature that expert-witness testimony is required.

### F. Promissory Estoppel

In Count Eight of the complaint, Plaintiff asserts a claim of promissory estoppel. Where a contract in fact exists, the doctrine of promissory estoppel is inapplicable as a matter of law. <u>Lunning v. Land O'Lakes</u>, 303 N.W.2d 452, 459 (Minn. 1980) ("There is no need to imply a contract here for both parties agree that a contract did exist."); <u>Del Hayes & Sons, Inc. v. Mitchell</u>, 230 N.W.2d 588, 593 (Minn. 1975). Because the parties do not dispute that they entered into a contract for the sale of goods, Plaintiff's claim of promissory estoppel is fatally defective.

Based upon the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment [Docket No. 28] is **GRANTED** as to Plaintiff's claim of Promissory Estoppel, and **DENIED** as to the remainder of Plaintiff's claims.


Dated: June 23, 2005						s/ Michael J. Davis
								Judge Michael J. Davis
								United States District Court